FILED
06/24/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 2, 2022

## IN RE DESTINY C.

**Appeal from the Juvenile Court for Franklin County**
**No. 2019-JV-129     Thomas C. Faris, Judge**

———————————————————

**No. M2021-00533-COA-R3-PT**

———————————————————

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that four grounds for termination as to the mother were proven: (1) abandonment by failure to visit; (2) persistent conditions; (3) substantial noncompliance with a permanency plan; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. The juvenile court also found that termination was in the best interests of the child. The mother appeals. We affirm.

**Tenn. R. App. P. Rule 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

Matthew S. Bailey, Spencer, Tennessee, for the appellant, Felicia D. C. P.

Herbert H. Slatery, III, Attorney General and Reporter and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.     FACTS & PROCEDURAL HISTORY

This case involves the termination of the parental rights of Felicia D. C. P. ("Mother") as to her second child, Destiny, born in August 2009. In 2011, officers were serving a warrant on an individual and found Mother and Destiny at the residence where 125 pseudoephedrine pills were also discovered. Mother submitted to a drug screen and tested positive for methamphetamine, amphetamine, opiates, and benzodiazepines. She then admitted that she had taken hydrocodone and xanax and had ingested

methamphetamine a few days prior. Destiny was removed into the protective custody of the Department of Children's Services ("DCS") on May 3, 2011, after DCS was unable to find any family members to place her with.[1]

The following day, DCS filed a "Petition for (Emergency) Temporary Legal Custody" alleging that Destiny was dependent and neglected. That same day, the juvenile court entered a protective custody order finding probable cause to believe that Destiny was dependent and neglected and awarding temporary legal custody to DCS. In August 2012, the juvenile court held a hearing regarding both of Mother's children and placed custody of the children with the maternal grandmother. The court ordered that Mother was not to reside with the maternal grandmother or have unsupervised visitation with the children until she had completed her alcohol and drug ("A&D") treatment. In September 2013, Mother completed an application for residency at The Next Door, a residential transition center that provided a six-month recovery program. It appears from her application to the program that she was incarcerated at the time and would be eligible for parole in October 2013.[2] Mother went on to complete the recovery program with The Next Door in 2014 and then resided with the maternal grandmother and the children.

In March 2018, Mother entered a medication-assisted treatment program at the Rapha Centre, where she again received therapy. She signed releases of information for DCS to obtain records of treatment. However, she was later discharged from the Rapha Centre in July 2018 due to noncompliance with the program's meeting requirements. In early 2018, both the maternal grandfather and the maternal grandmother died within a period of a few months. The maternal grandmother's cause of death was respiratory arrest due to an accidental overdose. Just hours after the maternal grandmother's death, DCS removed both of Mother's children into protective custody.

Thereafter, DCS filed a petition for temporary legal custody and ex parte order alleging that both children were dependent and neglected and should be placed in the custody of DCS. The petition explained that Mother was previously court ordered to have supervised visits due to her drug abuse history and that the children had been in DCS custody before. The juvenile court then entered a protective custody order and awarded temporary legal custody of the children to DCS. After a preliminary hearing, the juvenile

---

[1] Mother's first child, Carlos, was born in 2003. It is unclear from the record where Carlos was at this point; however, he became involved in later proceedings with the juvenile court. This appeal only involves termination of parental rights as to Destiny because it was determined that Carlos needed constant institutional supervision.

[2] A letter from the Metro Moore County Sheriff's Department notes that Mother was sentenced in December 2009 for conspiracy to commit aggravated burglary and was incarcerated for approximately 18 months. The letter also notes that when she was released from jail, she attended The Next Door and completed the recovery program there. While the dates do not add up, it appears this was the charge for which she was incarcerated. The letter was written in support of Mother in February 2018, stating that she "has turned her life around, and is being a productive citizen of the community."

court entered an order finding that probable cause was established to show that the children were dependent and neglected. The juvenile court then entered an adjudicatory order and order of disposition in June 2018, finding clear and convincing evidence that the children were dependent and neglected, and ordering that they remain in the custody of DCS.

Beginning in May 2018, DCS developed a total of five permanency plans applicable to Mother.[3] We summarize Mother's responsibilities as follows:

1. Obtain employment or apply for public assistance in order to provide for her children and provide proof of income to DCS;
2. Provide proof of housing applications to DCS, return the necessary paperwork to the housing authority regarding her housing application, obtain safe and stable housing, allow DCS to conduct a walkthrough of her home once obtained in order to ensure that it is safe and appropriate for her children, and refrain from illegal activity in the home;
3. Learn how to manage her oldest child's diabetes and how to administer his diabetes medication effectively;
4. Continue to attend scheduled appointments at the Rapha Centre, follow recommendations, and sign a release of information for DCS and the court-appointed special advocate ("CASA") in order for her progress to be monitored;
5. Submit to random drug screens;
6. Continue to attend scheduled counseling appointments, follow recommendations, and address grief and loss concerns in her counseling sessions;
7. Attend NA meetings, obtain a sponsor to help her overcome A&D issues, and provide proof of attendance to DCS and CASA;
8. Complete an A&D assessment, follow recommendations, and sign a release of information in order for her progress to be monitored;
9. Complete a detox program, contact DCS if unable to obtain transportation to the detox, and enroll in inpatient rehab;
10. Attend mental health treatment while in inpatient rehab if it is offered and continue mental health treatment upon returning from inpatient rehab;
11. Complete a mental health assessment, follow recommendations, and sign a release of information for DCS in order to monitor her progress;
12. Enroll in parenting classes, complete the required amount of parenting classes in order to receive a certificate of completion, and provide the certificate to DCS as proof of her completion;
13. Comply with the no-contact orders regarding contact with her children;
14. Attend medical appointments for her children when the no-contact orders are lifted;
15. Comply with all court orders regarding visitation; and

---

[3] There was a sixth permanency plan developed in May 2021, which was after the juvenile court had terminated Mother's parental rights. Therefore, this permanency plan did not include any responsibilities for Mother and listed adoption as the sole permanency goal.

16. Resolve any pending criminal charges, refrain from incurring any new criminal charges, and follow all rules of her probation officer.

Following the development of the initial permanency plan, Mother tested positive for benzodiazepines, opiates, and methamphetamine in June 2018. The juvenile court then entered an order noting that Mother tested positive on a drug screen and that temporary custody was to remain with DCS. The order was subsequently amended to order that Mother have no contact with the children due to her positive drug screen. In October 2018, the juvenile court entered another order stating that Mother was not allowed to have visitation unless Destiny's therapist approved.

After continuous efforts to encourage Mother to enroll in rehab, she finally participated in and completed a 30-day program with The Next Door in early 2019. She was then supposed to participate in an intensive outpatient program ("IOP"), but she only attended one session with Bradford Health Services. In April 2019, Bradford Health Services sent a letter to DCS providing an update on Mother's progress, which stated in part:

> [Mother] reports she has an appointment scheduled tomorrow with another treatment center. She reports she is considering switching providers for financial reasons. I have a lot of concerns, she had not been seen in over a week. If she doesn't met [sic] with staff tomorrow and provide documentation she will likely be given AMA discharge due to excessive absences. She has made minimal progress and is likely a high risk of relapse. [sic] at this time because she is not actively engaged in treatment.

Thereafter, Mother was under the care of a psychiatrist with Tullahoma Psychiatric. While she did not provide copies of prescriptions, Mother noted in her own handwriting that her psychiatrist prescribed her Wellbutrin, Trazadone, and Xanax. On her housing application submitted to Sober Living in May 2019, she only listed Trazadone under her current medications. Sober Living later responded to her application in December 2019 stating that she had a reservation with the facility. According to Mother's records, she enrolled in a parent education and family stabilization course in December 2019. It also appears that she made efforts to enroll in other programs in 2019, such as Centerstone, The Recovery Village, and Advanced Recovery Systems. However, it is unclear what came from these efforts.

In December 2019, DCS filed a petition to terminate Mother's parental rights as to Destiny.[4] DCS alleged four grounds for termination: (1) abandonment by failure to visit; (2) persistent conditions; (3) substantial noncompliance with a permanency plan; (4) failure

---

[4] DCS later filed an amended petition in April 2020 which sought to terminate the parental rights of Destiny's father as well.

- 4 -

to manifest an ability and willingness to assume custody or financial responsibility. Additionally, DCS alleged that termination was in the child's best interests. Mother filed an answer to the petition in September 2020, in which she asserted the defense that her failure to visit was not willful.

On March 2, 2021, approximately three weeks before the hearing, Mother filed a motion for recusal requesting that the judge recuse himself from her case due to his familiarity with Mother's family history in the juvenile court system when she was a child. On March 26, 2021, the judge addressed the motion for recusal at the hearing on the petition to terminate Mother's parental rights. He orally denied the motion, stating that if he were to recuse himself strictly on the basis of the motion, he would "never hear a juvenile case, because there would always be bad acts" that he had previously heard. However, he also stated that he "went back and looked at the files, there are orders from 2003, when I was not the juvenile judge." The juvenile court then proceeded to hear testimony from both parties.

During Mother's testimony, she admitted that, due to her drug use, custody of her children was taken from her several years ago and given to the maternal grandmother. Mother testified that somehow the maternal grandmother "wiggled her way" into getting custody of the children, despite being an even "worse drug addict." She explained that she and her brother were taken away from the maternal grandmother and the maternal grandfather years before. After completing a six-month program with The Next Door in July 2014, she resided with the maternal grandmother and the children. She then admitted to using drugs again in June 2018 but maintained that she had been clean before her children were removed in early 2018. The children were removed four or five hours after the maternal grandmother's death and supposedly witnessed her overdose. Due to the maternal grandmother's death and the children's removal, Mother explained that she just "kind of gave up." After testing positive on the drug screen in June 2018, Mother stated that she went to Bradford Health Services. She was then arrested in August 2018 for aggravated assault and aggravated burglary, which were dismissed and reduced to a lesser charge. She explained that she attempted to enroll in a program with Plateau Mental Health in October 2018, but they rejected her because she was not qualified. She further explained that the facility rejected her for insurance reasons.

Mother believed she had done the things she needed to do in order to be reunified with her children. She testified that she understood the purpose of the permanency plans and that she followed through with her responsibilities in order to get her children back. She explained that she completed an A&D assessment, submitted to random drug screens, completed a mental health assessment, obtained a suitable home, attended NA and AA meetings, and provided proof of those things. She also testified that she could provide proof of prescriptions for the medications she had tested positive for. At one point, however, she became frustrated during her testimony and stated, "That's [the] problem with this whole [expletive] up system here. Excuse my language." After a ten-minute

recess, counsel for Mother stated that Mother was reportedly "so sick" that she was unable to continue her testimony. Counsel for Mother asked for a continuance, but the juvenile court denied the motion. Thereafter, the judge stated that Mother's credibility was an issue. The judge explained that he had done his best to provide her with her day in court, but her history of attendance was not great and credibility was an issue for the court.

Ms. Lynn Ventola testified as the DCS case manager who was assigned to this case from April 2018 until December 2020. In May 2018, Ms. Ventola went over the initial permanency plan with Mother and provided her with the DCS form setting forth the criteria for termination of parental rights. She believed that the main thing Mother needed to address was her substance abuse because of Mother's extensive history with DCS concerning this issue. She also felt that Mother had experienced a great deal of trauma with the death of her parents and the children's removal. She believed that Mother needed to address this trauma in order to properly care for the children in the future.

In order to address the substance abuse, Ms. Ventola explained that Mother was required to complete an A&D assessment, follow recommendations, and sign releases of information for DCS. Mother was also required to provide proof of completion of her other tasks. After Mother failed a drug screen in June 2018, Ms. Ventola focused on attempting to get Mother help in some sort of program. However, not long after the failed drug screen, Mother was arrested and incarcerated for assault. When Ms. Ventola visited her in jail, Mother communicated that she was ready to attend rehab. Ms. Ventola called Memphis Recovery, but the facility was unable to do anything for Mother at the time because she was incarcerated. She left the facility's number with Mother and offered to take her to the facility if she needed transportation. She waited to see if Mother would follow up with Memphis Recovery, but Mother never did. Mother later wanted to know if it would even be worth attending rehab because she wanted to see her children. Ms. Ventola explained to her that attending rehab would probably increase her chances of seeing the children.

After Mother failed to follow up with Memphis Recovery, there was a meeting with her at the DCS office in November 2018. Mother informed DCS that she had found another rehab facility that she wanted to attend, but she was required to complete a detox program before she could qualify for the facility. Because the facility was in Nashville, Mother needed transportation. Ms. Ventola's supervisor offered to transport Mother, but Mother apparently did not go the day the supervisor attempted to pick her up. Afterward, Mother called Ms. Ventola and asked again for transportation to the facility. However, when Ms. Ventola arrived at Mother's home to take her, no one came to the door. Mother did not follow up with the facility after that. Following these attempts to enroll Mother in rehab, Mother finally completed a 30-day program at The Next Door in early 2019. Mother was supposed to complete outpatient treatment after completion of the 30-day program, but she only attended one session. In April 2019, Mother requested a drug screen and tested negative.

After April 2019, Mother ceased communication with Ms. Ventola for a couple of months. Ms. Ventola explained that communication with Mother was "off and on." She further explained that there was a pattern of Mother being unavailable: she would communicate at times on her own volition and other times she would be incommunicado. There were also times when Ms. Ventola attempted to visit Mother at her home, but Mother was never there. She explained that whenever she tried to visit Mother in person, Mother would never be available. In June 2020, Mother expressed that she wanted a second chance to complete her responsibilities, so Ms. Ventola asked her to submit to a drug screen. However, Mother refused and admitted that she would not pass the drug screen. Before Ms. Ventola transferred the case in late 2020, she offered to do a virtual walkthrough of Mother's home, but Mother did not answer when she called to do the walkthrough. As such, Ms. Ventola was never able to see the inside of Mother's home.

In sum, Ms. Ventola testified that she was unaware of Mother's progress with many requirements: whether she completed an IOP; whether she completed a mental health assessment; whether she obtained a suitable home; or whether she attended NA or AA meetings. She further testified that Mother never provided any information to get the no-contact order lifted and never came forward to demonstrate that she could provide for her children or that she had a viable income. She also was unaware if Mother continued to attend her scheduled appointments at the Rapha Centre. Over a two-and-half-year period, Mother had only made herself available for drug screens approximately two times. For these reasons, Ms. Ventola did not believe that Mother had made any significant accomplishment toward the permanency plans.

Ms. Ventola briefly testified about Destiny. She described the sort of problems that the child was experiencing which necessitated her therapist's approval in order for visitation to occur. She believed that the child had a lot of trauma due to the environment she was previously in. She explained that the child was not eating solid foods for a while and had described seeing a "black figure with red eyes that was scaring her." The child had expressed recently that she would like to be able to know Mother was doing okay and doing what she was supposed to, even after termination and adoption if possible. Ms. Ventola did not know if the child would have a negative reaction to seeing Mother, but that was a concern for her. She testified that the child had made peace with the fact that she might not be reunited with Mother. The child had come to accept the fact that an environment with Mother was not one she should be in.

The in-home care coordinator from Camelot testified concerning her work with both Mother and Destiny. The coordinator explained that she worked hand in hand with DCS and the child's therapist and identified what needed to be done. In August 2020, she began working with the child in the foster home by addressing coping skills, therapeutic situations, and emotional regulation. She testified that the child was doing okay and continuously asked how the Mother was doing. The child would discuss "what if this happens, or what if that happens and I can't be with Mom, or I can't see her." The child

was aware that Mother was not doing well and had done things that were not the best. She worried about Mother possibly passing away, which was an issue that they had to work through. The coordinator stated that the child referred to these worries as her "what if" worries. Despite wanting to see Mother, the child knew that was something she did not need to do right now. She was aware that Mother's progress was preventing visits from occurring and that Mother was still using drugs. The coordinator believed that this was causing the child additional stress. She stated that the child was mature for her age—which was 11-years-old at the time of the hearing—and was at a point where she was just ready to move on with her life.

In September 2020, the coordinator began working with Mother by monitoring and assisting in areas such as permanency, parenting strategies, and budgeting. She stated that Mother missed about half of her phone appointments. She explained that Mother was good about answering or calling back to schedule her appointments when they first started, but Mother got to the point where she would skip appointments or would not answer the phone. Communication between them became inconsistent, and Mother had poor follow through with the things she needed to do. When they were able to meet, Mother spoke a lot about turning in her paperwork. Despite making it clear to Mother that she was to turn in her paperwork to DCS upon completion, the coordinator testified that Mother never turned in any paperwork as far as she was aware.

Ms. Bonnie Wilson briefly testified as the DCS case manager that had been assigned to this case since March 2021. Ms. Wilson's testimony mainly concerned the communication she recently had with Mother. She explained that she attempted to contact Mother at one point but was unable to reach her. During a later conversation, she asked Mother to meet her at the DCS office in order to complete a drug screen and discuss the current permanency plan. However, Mother did not agree to meet with her at all and stated that it was "pointless." Ms. Wilson stated that they have not had any communication since then.

The foster mother testified that Destiny was currently in her home and had been there for approximately three years. Besides the child and herself, the foster home consisted of her husband, her biological son, and three adopted girls. She stated that there were a lot of problems when the child first came to her home. She explained that Destiny would not eat, would walk around on all fours like a dog, and "had a lot of stuff going on." However, the child was doing really well now. She was participating in gymnastics and was excited about going back to school because she had friends there. The foster mother believed that the child had grown to trust her and husband. She described the child as kindhearted and giving. She said that the child was able to be herself now.

The foster mother wished to adopt Destiny and stated that the child seemed to want to be adopted as well. She explained that the child had told her this and that adoption was something the child looked forward to. She noted that the child had wanted her aunts to

adopt her, but they were unable to do so. However, she explained that she and her husband had a good relationship with the child's aunts and that the child saw them occasionally. She said that contact with the child's aunts would continue after the adoption and believed it was a good idea to reach out to some of the child's family members. The foster mother testified that the child talked about Mother occasionally and loved and missed her. However, she explained that the child had accepted the way things were and understood that she needed stability. The child's expectation of potentially having Mother care for her again had diminished substantially.

In May 2021, the juvenile court entered an order terminating Mother's parental rights and a final decree of full guardianship.[5] The juvenile court found by clear and convincing evidence that four grounds for termination as to Mother were proven: (1) abandonment by failure to visit; (2) persistent conditions; (3) substantial noncompliance with a permanency plan; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. The juvenile court also found that termination was in the best interests of the child. The judge noted in its order that it granted DCS's motion to proceed in this cause and in Mother's absence, over the objections of Mother's counsel for the judge to recuse himself. Thereafter, Mother timely filed her appeal. Mother then filed a motion to supplement the record with her juvenile court records from 2003 when she was involved with the court as a child. Mother argued that the judge should have recused himself and held her family's record in the juvenile court against her. The judge, however, denied this motion noting that no consideration was given to the 2003 matter from the juvenile court. The judge explained that he was not on the bench at that time and did not have any recollection of the facts or testimony pertaining to the matter.

## II.    ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether the judge erred in denying Mother's motion to recuse;
2. Whether the juvenile court erred in finding that grounds existed to terminate Mother's parental rights; and
3. Whether the juvenile court erred in finding that termination of Mother's parental rights was in the best interests of the child.

For the following reasons, we affirm the decision of the juvenile court.

## III.    STANDARD APPLICABLE TO TERMINATION CASES

---

[5] The juvenile court's order also terminated the father's parental rights on the ground of failure to establish/exercise paternity; however, the father did not appeal.

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the juvenile court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). In regard to conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Motion to Recuse

- 10 -

On appeal, Mother first argues that the juvenile court erred when it denied her motion to recuse. She contends that the judge should have recused himself and that he ultimately held her family history against her when considering the grounds for termination and the best interests of the child. Thus, she asserts that the judge did exactly what she was concerned about in her motion to recuse.

We begin by reiterating the facts relevant to this issue. Mother filed a motion for recusal in March 2021 due to the judge's alleged familiarity with Mother's family history in the juvenile court system in 2003 when she was a child. Counsel for Mother admitted that a rule requiring a juvenile court judge to recuse himself based on "prior negative experience" with a parent's family would create a lot of conflicts given that many of these issues are generational, but he said he could not find any case law on point. Still, he insisted that there was a need to "find a judge that doesn't know anything about her family." At the beginning of the hearing in March 2021, the judge addressed the motion for recusal. He began by stating that "when I went back and looked at the files, there are orders from 2003, when I was not the juvenile judge. There are orders from 2011." He then orally denied the motion, stating as follows: "You can't hold it against her as to what her family has done. But if I recuse just strictly on the basis of this motion, I would never hear a juvenile case, because there would always be bad acts that I previously heard. Respectfully, I overrule."

Mother briefly testified at the hearing about her family history, explaining that the maternal grandmother was an even "worse drug addict" and that she and her brother were taken away from the maternal grandmother and the maternal grandfather years before. During his oral ruling at the hearing, the judge stated that "there was drug use in 2003 that cost custody of the mom's parents" when considering the ground of persistent conditions. Furthermore, when considering whether Mother failed to effect a lasting adjustment, in the best interest analysis, the judge stated, "Tell me how it's possible when she is the subject of her own petition in 2003." These statements were not incorporated into the final order. However, in his order terminating Mother's parental rights, the judge noted that Mother "has had issues back to 2003." The judge also noted that it granted DCS's motion to proceed in this cause and in Mother's absence, over the objections of Mother's counsel for the judge to recuse himself. After Mother filed her appeal, she filed a motion to supplement the record with her juvenile court records from the 2003 matter, which was denied by the judge. The judge stated that no consideration was given to the 2003 matter. He explained that he was not on the bench at that time and did not have any recollection of the facts or testimony pertaining to the matter. Thus, it appears that the judge's isolated statements about drug use dating back to 2003 may have been attributable to Mother's own testimony about her family history of drug use and the fact that she was removed from her own parents. "Any comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *State v. Wilson*, No. M2013-00306-CCA-10B-CD, 2013 WL 543862, at *7 (Tenn. Crim. App. Feb. 12, 2013) (quoting

*Alley v. State*, 882 S.W.2d 810, 822 (Tenn. Crim. App. 1994)).  As such, "if the basis for the comments stems from what the trial court learned during trial, recusal is not required." *Id.* (citing *Alley*, 882 S.W.2d at 821).

In regard to a motion to recuse, Tennessee Supreme Court Rule 10B, section 2.01, provides that "the trial court's ruling either can be appealed in an accelerated interlocutory appeal as of right . . . or the ruling can be raised as an issue in an appeal as of right . . . following entry of the trial court's judgment.  Tenn. Sup. Ct. R. 10B, § 2.01.  In both types of appeals, "the trial court's ruling on the motion for disqualification or recusal shall be reviewed by the appellate court under a de novo standard of review, and any order or opinion issued by the appellate court should state with particularity the basis for its ruling on the recusal issue."  *Id.*  Due to the adoption of Tennessee Supreme Court Rule 10B in 2012, we emphasize here that we no longer review this particular issue under the abuse of discretion standard of review, but "de novo, with no presumption of correctness accorded to the trial court."[6]  *In re Charles*, No. M2017-02387-COA-R3-PT, 2018 WL 3583307, at *6 (Tenn. Ct. App. July 25, 2018) (citing Tenn. Sup. Ct. R. 10B, § 2.01).

The Tennessee Supreme Court has explained that "one of the core tenets of our jurisprudence is that litigants have a right to have their cases heard by fair and impartial judges."  *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001) (citing *Kinard v. Kinard*, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998)).  "A motion to recuse should be granted when judges have any doubt about their ability to preside impartially in a case or when 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'"  *In re Charles R.*, 2018 WL 3583307, at *6 (quoting *Davis*, 38 S.W.3d at 564 (citation omitted)).  "[E]ven when a judge believes that he or she can hear a case fairly and impartially, the judge should grant the motion to recuse if 'the judge's impartiality might reasonably be questioned.'"  *Davis*, 38 S.W.3d at 565 (quoting Tenn. Sup. Ct. R. 10, R.J.C. 2.11).  Therefore, the test for whether a motion to recuse should be granted "is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias."  *Id.*; *see Alley,* 882 S.W.2d at 820.

When Mother filed her motion for recusal in March 2021, she argued that the judge's familiarity with the juvenile court proceedings in 2003 when she was a child supported recusal.  When addressing a similar issue, the Tennessee Supreme Court was not persuaded by this argument, explaining that "the mere prior knowledge of the existence" of other proceedings would not "lead a person of ordinary prudence to question a judge's impartiality." *Beard v. Bd. of Pro. Resp.*, 288 S.W.2d 838, 861 (Tenn. 2009). Furthermore, "prior knowledge of facts about [a] case is not sufficient in and of itself to require

---

[6] "Prior to the adoption of Tennessee Supreme Court Rule 10B, effective July 1, 2012, the appellate courts reviewed recusal decisions pursuant to the more deferential abuse of discretion standard." *Duke v. Duke*, 398 S.W.3d 665, 668 n.2 (Tenn. Ct. App. 2012); *see State v. Hester*, 324 S.W.3d 1, 73 (Tenn. 2010).

disqualification." *State v. Reid*, No. M2003-00539-CCA-R3-DD, 2005 WL 1315689, at *25 (Tenn. Crim. App. June 3, 2005) (citing *Alley*, 882 S.W.2d at 822). Moreover, we emphasize again that the judge was not even on the bench during the 2003 matter. Therefore, we affirm the juvenile court's denial of Mother's motion for recusal.

One final issue regarding recusal warrants discussion before we move to the merits of this case. The procedure used by the juvenile court judge to resolve the motion did not fully comply with Rule 10B. The Rule provides:

> The procedures set out in this rule shall be employed to determine whether a judge should preside over a case.
>
> Section 1. Motion Seeking Disqualification or Recusal of Trial Judge of Court of Record.
>
> . . .
>
> 1.02. *While the motion is pending, the judge whose disqualification is sought shall make no further orders and take no further action on the case*, except for good cause stated in the order in which such action is taken.
>
> 1.03. Upon the filing of a motion pursuant to section 1.01, the judge shall act promptly by written order and either grant or deny the motion. If the motion is denied, *the judge shall state in writing the grounds upon which he or she denies the motion.*

Tenn. Sup. Ct. R. 10B, §§ 1.02 and 1.03 (emphasis added).

"Rule 10B, Section 1.02 requires the trial court to first analyze the motion to disqualify before proceeding to any substantive issues in the case." *In re Estate of Abbott*, No. W2017-02086-COA-T10B-CV, 2017 WL 4864816, at *2 (Tenn. Ct. App. Oct. 27, 2017). In the case at bar, the judge heard the motion for recusal first at the termination hearing, orally denied it, and then proceeded with the substantive issues of the termination hearing.

In *In re Conservatorship of Tate*, No. M2012-01918-COA-10B-CV, 2012 WL 4086159, at *1 (Tenn. Ct. App. Sept. 17, 2012), the trial court judge heard both a motion for recusal and a "motion to sell" on the same date and ruled on both from the bench. However, the order on the motion to sell was entered several days before the order denying the motion for recusal. *Id.* On appeal, Mr. Tate argued that the trial court violated Section 1.02 by ruling on the motion to sell while the motion for recusal was "pending." *Id.* at *3. This Court agreed that "[t]he better practice would have been to enter the order denying the motion for recusal before entering the order on the motion to sell." *Id.* Under the

circumstances, however, we could not conclude that the trial court violated Rule 10B. *Id.* We further found that "the issue is moot in light of our decision affirming the denial of the motion for recusal." *Id.*

Similar to *In re Conservatorship of Tate*, it would have been better practice for the juvenile court to immediately enter a written order denying the recusal motion before proceeding with the termination hearing, but we find that this is not reversible error in light of the fact that we have affirmed the denial of the motion for recusal on appeal.

The second issue we perceive involves the juvenile court's written order. According to Rule 10B, "the judge shall act promptly by written order and either grant or deny the motion. If the motion is denied, the judge shall state in writing the grounds upon which he or she denies the motion." Tenn. Sup. Ct. R. 10B, § 1.03. In *Prewitt v. Brown*, No. M2017-01420-COA-R3-CV, 2018 WL 2025212, at *9 (Tenn. Ct. App. Apr. 30, 2018), this Court said that a trial judge "failed to fulfill his Tenn. Sup. Ct. R. 10B responsibilities when he denied the motion to recuse by simply stating: 'Plaintiff's motion for recusal is hereby denied.'" We explained that this was "woefully inadequate" because Rule 10B clearly states that "[i]f the motion is denied, the judge must state in writing the grounds upon which he or she denies the motion." *Id.* (quoting Tenn. Sup. Ct. R. 10B, § 1.03). Therefore, we further explained that "[d]ue to the deficiencies in the trial court's order, if this court had any uncertainty concerning whether recusal was appropriate, we could choose to remand with instructions for the trial judge to comply with the mandate in Section 1.03, or reverse with instructions for the trial court to grant the motion." *Id.* However, we chose to affirm the decision to deny the motion for recusal instead, noting that the grounds asserted did not merit disqualification. *Id.*

Here, the judge provided a short explanation in its oral ruling as to why he was denying the motion, but it was not incorporated by reference in his order. The termination order simply stated that the judge proceeded over the objection of Mother's counsel to recuse himself from these proceedings. Despite these deficiencies in the order, we affirm the denial of the motion for recusal because we find no error with the juvenile court's decision. We also note that the parties did not raise any issue on appeal about the lack of specific findings on the grounds for recusal or the procedure used.

## B. Grounds for Termination

We now address whether the juvenile court erred in finding that grounds existed to terminate Mother's parental rights. The juvenile court found that DCS met its burden of proof on the following grounds: (1) abandonment by failure to visit; (2) persistent conditions; (3) substantial noncompliance with a permanency plan; and (4) failure to manifest an ability and willingness to assume custody or financial responsibility. We review the juvenile court's finding as to each ground.

### 1. Abandonment by Failure to Visit

One ground for termination exists due to a parent's abandonment of his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). One definition of abandonment provided under section 36-1-102(1)(A)(i) is:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). "Failed to visit" is defined as "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Additionally, "[t]hat the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C).

DCS filed a petition to terminate Mother's parental rights in December 2019.[7] Mother then filed an answer asserting a defense to abandonment by failure to visit, in which she alleged that her failure to visit was not willful. She was subject to a no-contact order prior to the filing of the petition, which was due to her positive drug screen in June 2018. The no-contact order was later amended to require the approval of the child's therapist in order to have visitation. Mother argues in her appellate brief that this condition was outside of her control because the child also needed to make progress in therapy. As such, Mother avers that the therapist's lack of approval was a significant restraint of or interference with her efforts to support or develop a relationship with the child. DCS contends that while the child's progress in therapy may have been outside of Mother's control, Mother's own actions were not.

In finding this ground against Mother, the juvenile court explained that Mother never made efforts over the course of a three-year period to show the court that she should

---

[7] Although DCS filed an amended petition in April 2020, the amended petition did not allege a new four-month period for the ground of abandonment by failure to visit. Rather, it only added a ground against the father.

have the no contact order lifted. At the time the petition was filed, Mother had struggled with substance abuse for nearly a decade. In 2011, she tested positive for several substances after a drug screen and admitted to using hydrocodone, xanax and methamphetamine a few days prior. Mother then participated in six-month recovery program with The Next Door, which she completed in July 2014. In March 2018, she entered a medication-assisted treatment program at the Rapha Centre, but was later discharged due to noncompliance with the program's expectations for missing twelve of her scheduled appointments. She tested positive for several substances in June 2018, which led to the no-contact order. She explained that she just "kind of gave up" after the maternal grandmother died in April 2018. Around this time, Ms. Ventola explained to her that attending rehab would probably increase her chances of seeing the child. She eventually completed a 30-day program with The Next Door in early 2019. However, she then failed to complete the recommended IOP with Bradford Health Services afterward and ceased communication with Ms. Ventola for a couple of months. According to a letter from Bradford Health Services, she had made "minimal progress" and was "a high risk of relapse." Mother then refused to submit to a drug screen in June 2020 and admitted that she would not pass. She had only made herself available for two drug screens during the time Ms. Ventola was the DCS case manager. Ms. Ventola was unaware if Mother ever completed an IOP or attended NA or AA meetings. Additionally, Ms. Ventola testified that Mother failed to provide any information to support lifting the no-contact order. In March 2021, Ms. Wilson asked Mother to submit to a drug screen, but Mother responded by stating that it was "pointless."

This Court has explained that "[w]illful conduct consists of acts or failure to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863 (citations omitted). It is also well established that a willful failure to visit a child may be found in light of a parent's continued drug use when the parent is prohibited from visiting a child until passage of a drug test. *See In re Addison P.*, No. E2016-02567-COA-R3-PT, 2017 WL 1861781, at *7 (Tenn. Ct. App. May 8, 2017) ("This Court has repeatedly held that '[a] parent's choice to continue to use drugs when the parent is prohibited from visiting the child until passage of a drug test constitutes a willful failure to visit the child.'") (quoting *In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010)); *see also In re Jaylah W.*, 486 S.W.3d 537, 551-52 (Tenn. Ct. App. 2015), *perm. app. denied* (Feb. 1, 2016) ("It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness."); *In re Bonnie L.*, No. M2014-01576-COA-R3-PT, 2015 WL 3661868, at *8 (Tenn. Ct. App. June 12, 2015) (concluding that father's failure to visit was willful because he was aware of the opportunity to visit the children by merely submitting to and passing drug screens but that father "failed drug tests, refused to take tests, or made himself unavailable for such testing"); *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015) (rejecting mother's argument that her failure to visit was not willful because the trial court suspended her visitation and noting that the suspension was "the

direct result of her failure to produce negative drug screens"); *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) ("[W]hen a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit."); *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010) (rejecting father's argument that the existence of a no-contact order prevents a finding of willfulness for failure to visit because the proof indicated that father was aware that he would be permitted visitation if he passed a drug test); *State Dep't of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005) (opining that a parent's decision to refuse to cooperate with certain conditions related to the resumption of visitation constitutes a "willful choice").

While Mother did make efforts early on, her efforts were minimal and her attitude worsened until she became indifferent to her situation. She may blame the "system," but ultimately her own actions demonstrate that she was unwilling to address her substance abuse in order to see the child. She was aware of the consequences of her failure to address her substance abuse because she was provided with the DCS form setting forth the criteria for termination of parental rights. Even the child was aware that visits were not occurring due to Mother's lack of progress with her substance abuse. The child worried about Mother possibly passing away from drug use, which supported that the therapist's approval of visitation was warranted. Mother took a step in the right direction by completing the 30-day program, but then her efforts quickly declined when she only attended one IOP session and then ceased communication with Ms. Ventola for months afterward. Her behavior and lack of follow through with IOP prevented visitation with the child. We therefore find that Mother failed to meet her burden of establishing a lack of willfulness. Due to the no-contact order that remained in place, Mother had no contact or visitation with the child in the relevant four-month period immediately preceding the filing of the petition in December 2019. As such, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by failure to visit.

### 2. Persistent Conditions

The second ground for termination at issue on appeal is commonly known as "persistent conditions." This ground for termination applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that,

- 17 -

in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element for this ground must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. This Court has stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child."). "The necessary order of removal is 'the threshold consideration' for this ground." *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015)).

In May 2011, DCS filed a "Petition for (Emergency) Temporary Legal Custody" alleging that the child was dependent and neglected. The child was removed from Mother's legal custody after the juvenile court entered a protective custody order finding probable cause to believe that she was dependent and neglected. After a successful trial home placement, the juvenile court awarded legal custody of the child to the maternal grandmother and prohibited Mother from residing in that home until she had completed her A&D treatment. Mother later resided with the maternal grandmother and the child after completing the six-month recovery program with The Next Door in July 2014. In April 2018, following the death of the maternal grandmother, DCS filed a petition for temporary legal custody and ex parte order alleging that the child was dependent and neglected. The juvenile court then entered a protective custody order finding probable cause to believe that the child was dependent and neglected. The juvenile court returned temporary legal custody of the child to DCS. Therefore, "'the threshold consideration' for this ground" is satisfied. *In re Lucas S.*, 2021 WL 710841, at *4 (quoting *In re Alleyanna*

*C.*, 2015 WL 4773313, at \*14).  The child was removed from Mother's legal custody in May 2011 by a court order after the filing of DCS's petition alleging that the child was dependent and neglected.  Although Mother later resided with the maternal grandmother and the child, Mother had not had legal custody of the child since May 2011.  Those seven years far exceeded the six-month period of removal required by the statute and accrued before the first date the petition was set to be heard.  *See* Tenn. Code Ann. §§ 36-1-113(g)(3)(A) and 36-1-113(g)(3)(B).

The main thing Mother needed to address was her substance abuse.  Mother admitted that custody of the child was taken from her several years ago due to her drug use.  She also admitted to using drugs again in June 2018, which resulted in a positive drug screen for benzodiazepines, opiates, and methamphetamine.  Although she had completed a six-month program and a 30-day program with The Next Door, she continued to struggle with substance abuse.  In June 2020, she refused to submit to a drug screen and admitted that she would not pass.  In March 2021, she refused to submit to a drug screen again and stated that it was "pointless."  Moreover, she received probation violations in January 2019, which were drug related.  For these reasons, we find that the conditions that led to the child's removal still persist, which prevents the child's safe return to Mother's care and would likely cause the child to be subjected to further abuse and neglect.  *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

As explained before, Mother had struggled with substance abuse for nearly a decade at the time the petition was filed.  Due to the extensive history of Mother's substance abuse, there is little likelihood that these conditions will be remedied at an early date in order for the child to be safely returned to Mother in the near future.  *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii).  Furthermore, the continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.  *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).  Although the child loved and missed Mother, she understood that she needed stability, had made peace with the fact that she might not be reunited with Mother, and had come to accept the fact that an environment with Mother was not one she should be in.  The child had reached a point where she was ready to move one with her life because she believed that Mother was "never going to change."

To the extent that the juvenile court may have considered Mother's involvement in the juvenile court system as a child in 2003, we conclude that the error was harmless.  *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").  There was clear and convincing evidence to demonstrate that Mother's substance abuse persisted from the child's removal in 2011 until petition was filed in December 2019.  *See In re Yvonne R.*, No. E2016-02246-COA-R3-JV, 2017 WL 2842866, at \*5 (Tenn. Ct. App. Apr. 3, 2017) (noting that it was error for the court to rely

- 19 -

on records that were not admitted into evidence, but the error was harmless because there was still clear and convincing evidence even when disregarding the records). Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of persistent conditions.

### 3. Substantial Noncompliance with a Permanency Plan

The third ground for termination at issue on appeal exists based on a parent's substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). In order to terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial and the requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. When analyzing the requirements of the permanency plan, "noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* at 548. Determining whether a parent has sufficiently complied with a permanency plan "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537.

We summarized Mother's responsibilities from the permanency plans above, which included responsibilities related to employment, housing, drug use, mental health, parenting, criminal activity, and providing proof of progress in all of these areas. We conclude that the requirements were reasonable and related to the conditions necessitating foster care placement. Mother understood the purpose of the permanency plans and maintained that she followed through with her responsibilities. She testified that she signed her releases, completed inpatient rehab, participated in outpatient rehab, obtained a suitable home, and attended NA and AA meetings. Conversely, Ms. Ventola did not believe that Mother had made any significant accomplishment toward the permanency plans and explained that Mother had failed to provide proof of progress for several of her requirements. There is evidence that Mother received treatment or care from several different programs, such as The Next Door, the Rapha Centre, Bradford Health Services, and Tullahoma Psychiatric. There is also evidence that she signed some releases of information for DCS to obtain records of her treatment. Regardless of the proof of Mother at least attempting to address this specific issue, she failed to provide proof of her progress for many other responsibilities. Although she testified that she completed many of her responsibilities, the judge found that her credibility was an issue.

Furthermore, the facts demonstrate that Mother had a history of being difficult despite the efforts of others who were trying to help her. After Mother failed her drug screen in June 2018, Ms. Ventola made several attempts to help Mother enroll in a rehab facility in both Memphis and Nashville by offering transportation or providing the contact information for the facility. Despite communicating that she was ready to go to rehab, Mother failed to follow through with these facilities or did not make herself available when

- 20 -

transportation arrived for her. In addition to this, Ms. Ventola was never able to see the inside of Mother's home because Mother either made herself unavailable or was incommunicado. The in-home care coordinator also testified that Mother was inconsistent with communication, had poor follow through with the things she needed to do, and failed to turn in her paperwork despite constantly being reminded to do so. Throughout this time, Mother engaged in criminal activity and was charged with several offenses, including assault, probation violations, and license violations. When Mother expressed that she wanted a second chance to complete her responsibilities, the first thing she did afterward was refuse a drug screen and admit that she would not pass.

Despite allowing Mother ample time to straighten out her life, Mother's situation had changed very little from the time the child was removed from her legal custody in 2011. Even after the initial permanency plan was created in May 2018, she was difficult, noncommunicative, and unavailable. During Ms. Ventola's time as the DCS case manager, Mother failed to demonstrate anything significant in terms of follow through. Additionally, it was noted that Mother had "poor follow through" and that "her history of attendance [was] not great." The degree of her noncompliance given the amount of time she had to address her issues was substantial. As such, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of substantial noncompliance.

## 4. Failure to Manifest an Ability & Willingness to Assume Custody or Financial Responsibility

The final ground for termination at issue on appeal exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). For this statutory ground, two elements are necessary to prove. *In re Neveah M.*, 614 S.W.3d at 674. The first element "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Accordingly, "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness" satisfies the first element of this ground. *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). A parent's ability to assume custody or financial responsibility is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). It is common for parents to state that they are willing to assume custody or financial responsibility for their children. However, as we have explained, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). The second element requires the petitioner to establish that "placing the child in the [parent's] legal and physical custody would pose a risk of

substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d at 677.

As we have already established, very little had changed regarding Mother's situation since the child was removed from her legal custody in 2011. For a time, it appeared that Mother had "turned her life around." After the child was removed from her custody in May 2011, Mother eventually completed a six-month program with The Next Door in July 2014, which, to her credit, was a significant step toward achieving long-term sobriety. However, Mother then experienced a great deal of trauma in early 2018 due to the death of her parents and the subsequent removal of her children. Afterward, Mother explained that she was "in shock" and just "kind of gave up." This led to Mother relapsing and testing positive on a drug screen in June 2018 for some of the same drugs she had used in 2011. At the time, she was participating in a medication-assisted treatment program at the Rapha Centre, but she was later discharged after missing twelve of her scheduled appointments. After several failed attempts to encourage her to enter rehab, Mother finally completed a 30-day program with The Next Door in early 2019. Yet, she then failed to follow through with the recommended IOP and only attended one session with Bradford Health Services. Mother tested negative on a drug screen around this time, but it was a drug screen she had requested. After April 2019, Mother ceased communication with Ms. Ventola for a couple of months. Ms. Ventola tried to visit Mother at her home, but Mother was never there or was not communicating with Ms. Ventola.

After the petition for termination was filed, Mother refused to submit to a drug screen in June 2020 and March 2021, the latter of which she stated was "pointless." At the time of the hearing, however, she testified that she could pass a drug screen. Mother's cousin offered a letter of support before the hearing, stating that Mother had "worked hard on her sobriety" despite the stress she had experienced from losing her parents and having the children taken from her within a short period of time. Nevertheless, we note that regardless of her efforts, or lack thereof, to achieve sobriety, Mother also engaged in criminal activity and incurred several charges against her related to drugs. Therefore, Mother's lifestyle demonstrated that she lacked the ability to assume custody of the child and her actions demonstrated that she was unwilling to assume custody of the child. Due to the environment the child had been in before she was removed, the child carried a lot of trauma, which affected her ability to eat solid foods and caused her to see things. Since her time in foster care, the child was doing well and had grown to the point she was ready to move on her with her life. Given the the fact that Mother failed to address her substance abuse, which left uncertainty whether the environment with Mother has since changed, returning the child to Mother's legal and physical custody would have posed a risk of substantial harm to the child's physical and psychological welfare. *See* Tenn. Code Ann. § 36-1-113(g)(14). As such, we affirm the juvenile court's finding that DCS met its burden of proof on this ground.

### C. Best Interests of the Child

To review whether termination was in the best interests of the child, we "must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the child's best interests from the child's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. April 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

The first statutory factor is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . [.]" Tenn. Code Ann. § 36-1-113(i)(1). We have already found that the conditions that led to the child's removal still exist. Foremost, Mother failed to address her substance abuse. She engaged in criminal activity and incurred several charges against her related to drugs. She also failed to make herself available in order to allow Ms. Ventola to inspect her home to ensure it was safe and stable for the child. We find that this factor weighs in favor of termination.

The second statutory factor is "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(2). Ms. Ventola went over the initial permanency plan with Mother and provided her with the DCS form setting forth the criteria for termination of parental rights. She made several attempts to help Mother enroll in a rehab facility by offering transportation or providing the contact information for the facility. Mother failed to follow through with these facilities or did not make herself available when transportation arrived for her. Ms. Ventola also discussed with Mother the availability of a grant program that would have provided free mental health treatment for her if she would have just showed up. The in-home care coordinator testified that Mother missed about half of her appointments, was inconsistent with communication, had poor follow through with the things she needed to do, and failed to turn in her paperwork despite constantly being reminded to do so. Despite the efforts of DCS and others, Mother failed to effect a lasting adjustment. We find that this factor weighs in favor of termination.

The third statutory factor is "[w]hether the parent . . . has maintained regular visitation or other contact with the child[.]" Tenn. Code Ann. § 36-1-113(i)(3). As previously discussed, Mother was subject to a no-contact order, which was due to her

positive drug screen in June 2018. As previously stated, the no-contact order remained in place because Mother never adequately addressed her substance abuse. Therefore, at the time of the hearing, Mother had not had any visitation or other contact with the child in almost three years. We find that this factor weighs in favor of termination.

The fourth statutory factor is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). The child talked about Mother occasionally and loved and missed her. She had expressed that she would like to be able to know Mother was doing okay and doing what she was supposed to, even after termination and adoption if possible. However, she was at a point where she was just ready to move on with her life and wanted to be adopted. The child's expectation of potentially having Mother care for her again had diminished substantially. As a result of Mother's persistent substance abuse, the no-contact order remained in place and Mother and the child had not had contact for several years. We find that this factor weighs in favor of termination.

The fifth statutory factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.]" Tenn. Code Ann. § 36-1-113(i)(5). There were many problems when the child first arrived at her foster home, but she was doing well at the time of the hearing. She had been in foster home for approximately three years, expressed to the foster mother that she wanted to be adopted, and looked forward to adoption. She loved and missed Mother, but she had made peace with the fact that she might not be reunited with her. She had accepted the way things were and understood that she needed stability. We find that this factor weighs in favor of termination.

The sixth statutory factor is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). Both of Mother's children were adjudicated dependent and neglected in June 2018. With respect to Destiny, it was believed that she had trauma due to the environment she was in with Mother. When she entered foster care, she would not eat solid foods for a time, was seeing things, and "had a lot of stuff going on." We find that this factor weighs in favor of termination.

The seventh statutory factor is "[w]hether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]" Tenn. Code Ann. § 36-1-113(i)(7). Ms. Ventola was never able to inspect Mother's home because Mother made herself unavailable or could not be contacted. After several years, Mother failed to address her substance abuse and continued to incur criminal charges, which left uncertainty whether the environment with Mother has changed since

the child was removed.  Therefore, we find that this factor weighs in favor of termination.

The eighth statutory factor is "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child[ren] or prevent the parent . . . from effectively providing safe and stable care and supervision for the child[.]"  Tenn. Code Ann. § 36-1-113(i)(8).  Mother had experienced a lot of trauma with the death of her parents and with her children's removal, which was something she would need to address in order to properly care for the child in the future.  These events led to her relapsing and testing positive on a drug screen in June 2018.  Afterward, she was required to complete a mental health assessment, but she never provided proof of that assessment to Ms. Ventola.  We find that this factor weighs in favor of termination.

The ninth statutory factor is "[w]hether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101."  Tenn. Code Ann. § 36-1-113(i)(9).  In its appellate brief, DCS admits that it did not offer proof to establish whether Mother paid child support.  However, it noted that there was a document in the record, which was included in a collection of documents submitted by Mother, that indicated she owed past-due child support.  Given the limited evidence in the record regarding child support, we find that this factor is neutral.

After reviewing the best interest factors, we conclude that the juvenile court properly determined that termination of Mother's parental rights was in the child's best interests.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court.  Costs of this appeal are taxed to the appellant, Felicia D. C. P., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE